| UNITED STATES DISTRICT COURT | USDC SDNY |
| SOUTHERN DISTRICT OF NEW YORK | DOCUMENT ELECTRONICALLY FILED |
| | DOC#: _____ |
| | DATE FILED: 3-29-19 |

| IGT, | |
| --- | --- |
| Plaintiff, | 17-CV-9792 (ALC) |
| -against- | **OPINION AND ORDER** |
| HIGH 5 GAMES, LLC | |
| Defendant. | |

**ANDREW L. CARTER, JR., United States District Judge:**

IGT and High 5 Games, LLC ("H5G") each contend that the opposing party has violated a provision of their contract related to the approval of trademark uses. IGT contends that H5G failed to remove uses of IGT's trademarks following IGT's rejection of their proposed uses. H5G, in turn, argues that IGT's refusals were unreasonable, and thus IGT is in breach of the contract. At the heart of their current dispute is how to define "reasonable" approval.

For the following reasons, the Court adopts the following definition for determining whether IGT's refusals of H5G's proposed uses of its trademarks were reasonably withheld: Whether IGT had an objective basis that would be acceptable from a reasonable trademark owner's viewpoint.

## BACKGROUND

The Court only discusses facts relevant to resolve the instant dispute.

On January 1 2016, IGT and H5G executed a Settlement Agreement which set forth their rights to uses of certain trademarks. On December 14, 2017, IGT filed the complaint commencing this action, alleging trademark infringement, federal unfair competition, breach of

1

contract, and violations of New York's General Business Law related to H5G's use of certain trademarks ("Accused Marks").[1] ECF No. 1 ("Compl"). On December 26, 2017, IGT sought a preliminary injunction based on alleged violations of § 9(e) of the Settlement Agreement (which permits H5G's use of certain trademarks "for any purpose other than use within a casino-style slot game") and § 9(f) of the Settlement Agreement (which, *inter alia*, requires H5G to submit proposed uses of IGT's trademarks for approval, and that "such approval [is] not to be unreasonably withheld"). ECF No. 9. Following briefing and oral arguments, the Court denied IGT's motion with respect to § 9(e) (*see* ECF No. 44) and granted its motion with respect to § 9(f). ECF No. 69.

IGT has subsequently twice charged H5G with violating this Court's preliminary injunction, which H5G has opposed. *See* ECF Nos. 70, 71, 76-81, 92, 94-96. In response to these filings, on May 22, 2018 this Court issued an Order stating that, from its perspective, there are currently two central unresolved issues of fact: (1) what standard governs the determination of "reasonableness" under § 9(f) and (2) whether IGT's refusals to approve H5G's proposed uses were "reasonable" within the meaning of § 9(f). ECF No. 100. Following a status conference, on May 30, 2018 the Court ordered the parties to brief the first question. The parties submitted their initial briefs on June 19, 2018 (ECF Nos. 112-13); responses on July 3, 2018 (ECF Nos. 118-19); and replies on July 10, 2018 (ECF Nos. 120, 122). Accordingly, the Court considers this issue fully briefed.

---

[1] The original complaint sought relief for H5G's use of the "GOLDEN GODDESS" and "CATS" trademarks. On January 31, 2018, IGT amended its complaint to include, *inter alia* violations of the "DA VINCI DIAMONDS" trademark. ECF No. 56.

# DISCUSSION

## I. Definition of Reasonableness

The parties agree that the standard for "reasonableness" is a question of law for this Court. They further agree that the standard must be objective. They disagree, however, as to the contours of that standard. IGT contends that the standard should be "whether IGT had an objective basis that would be acceptable from the viewpoint of a reasonable trademark owner regarding the uses of [the infringing trademarks] proposed by H5G." Pl's. Mem. at 2. H5G, in contrast, asserts that the standard should be whether IGT articulated a factual objective basis "in a sufficiently detailed manner that (a) provides clear notice of what the licensee would have to modify to overcome such withholding of consent and (b) ensures any withholding of consent is not arbitrary or sets out to alter a fundamental license right in the Settlement Agreement." Def's. Mem. at 15.

This Court agrees with the parties that "[u]nder New York law, the initial interpretation of a contract is a matter of law for the court to decide." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (citation omitted). Furthermore, the Court concurs that the standard must be objective. *See Murphy v. 253 Garth Tenants Corp.*, 579 F. Supp. 1150, 1156 (S.D.N.Y. 1983) (phrase "'unreasonably be withheld' requires something more than [a] subjective explanation . . . since by its very language the 'unreasonable' term invokes an objective, third-party standard."); *accord Hoag v. Chancellor, Inc.*, 246 A.D.2d 224, 231 (App. Div.1st Dep't 1998) ("[T]he standard for determining whether consent was unreasonably upheld is an objective one."). The Court may consider industry norms to make this objective determination. *Hoag*, 246 A.D.2d at 231 (citation omitted).

Below, the Court addresses each party's position on interpreting this objective standard.

3

## A. Reasonableness from the Perspective of a Reasonable Trademark Owner

IGT believes the Court must look to whether IGT had an objective basis for refusing its approval from the perspective of a reasonable trademark owner. In support of this proposal, IGT relies primarily on *ESPN v. Office of Major League Baseball ("Baseball")*, one of the few Second Circuit cases that addressed similar contractual language. There, the court considered a contract providing that, "with the prior written approval of Baseball, which shall not be unreasonably withheld or delayed, ESPN may . . . preempt" up to ten baseball games per year for "an event of significant viewer interest." *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 386 (S.D.N.Y. 1999). ESPN sued, contending that Baseball had unreasonably withheld its approval for multiple games. *ESPN*, 76 F. Supp. 2d at 387.

As here, the contract did not mention how to determine reasonableness. The court held that "ESPN [the party seeking approval] cannot be the judge of whether Baseball [the party with approval authority] is acting reasonably." *ESPN*, 76 F. Supp. 2d at 400. If that were the case, "Baseball's approval right would be rendered meaningless; ESPN could simply preempt the ten games of its choice and then determine that any objections Baseball expressed were 'unreasonable.'" *Id.*

H5G contests IGT's interpretation of *Baseball*. It argues that since the decision addressed motions in limine, it does not provide guidance on dispositive resolutions. Def's Opp'n. at 12. While some aspects of the decision may be irrelevant for this reason, its interpretation of the term "reasonableness" in a largely similar contract is still relevant to the Court's analysis. As discussed further below, H5G also argues that such a standard allows IGT to be the final arbiter of its own reasonableness. Yet addressing the same concern, the *ESPN*

4

Court noted that a court would ultimately determine whether the rejection was objectively reasonable. *ESPN*, 76 F. Supp. 2d at 400 n.17. The same process can apply here.

### B. Information Known to IGT

IGT contends that this reasonableness determination should be "based on the information known to IGT at that time." Pl's. Mem. at 4. H5G responds that judging reasonableness based on "facts known to IGT" is "expressly subjective" because it "inherently requires a one-sided view of a particular issue." Def's Opp'n. at 5-6.

As IGT discusses however, H5G seemingly misconstrues the proposed standard. Looking to the information available to IGT does not make the analysis inherently subjective. Instead, it provides helpful context in assessing whether a reasonable trademark owner in that situation would have an objectively reasonable basis to reject the proposed use. Further, it is consistent with standards for objective reasonableness in other contexts. *See e.g., Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 (2d Cir. 2014) ("objective prong of the reasonable belief test [in whistleblower retaliation provision of Sarbanes-Oxley Act] focuses on the basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience"); *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221-22 (2d Cir. 2004) (hostile work environment assessed based on "reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by its target").

### C. Motive

H5G contends that, in addition to the information available to IGT, the Court must also look to IGT's motive for disproving requests. H5G notes that the court in *ESPN* considered motive to be "critical" to determine reasonableness. *ESPN*, 76 F. Supp. 2d at 407. There, the

5

Court addressed a motion in limine concerning the admissibility of existing evidence that ostensibly demonstrated Baseball's improper motive for refusing permission. *Id.*

Motive evidence is not relevant to the limited question presented here: the definition of reasonableness under § 9(f). Such evidence would likely be pertinent to a court's application of the definition. At that stage, H5G may proffer evidence suggesting that IGT's determination was unreasonable based on, for instance, an illicit motive. The Court would then consider the admissibility of such evidence. If it is admissible, IGT could contest it by arguing it had objectively reasonable reasons for denying approval.

### D. Placement of Burden

IGT contends that H5G bears the burden of proof in this analysis. It relies on *ESPN*, where the Court determined that ESPN bore the burden of commencing litigation because under the terms of the contract, Baseball would "perform . . . first in time by either granting or withholding its approval." *ESPN*, 76 F. Supp. 2d at 400 n.17. As the party contesting that determination, ESPN "[sought] to alter the status quo" and thus was required to bring the challenge. *Id.* IGT also notes that in *Rey v. Lafferty*, relied on by H5G, the court likewise placed the burden on the licensee, the party that contested the reasonableness determination. *See Rey v. Lafferty*, 990 F.2d 1379, 1394 (1st Cir. 1993) ("[Licensee] did not present sufficient evidence to enable a finding that [Licensor's] actions with respect to [the product] were 'unreasonable'"). The Court agrees that placing the burden on IGT would effectively alter the contract and IGT's right of approval.

H5G contends that this framework would effectively give IGT "a presumption of acting with 'reasonableness.'" Def. Opp'n. at 5. However, IGT's proposal does not afford it a presumption of reasonableness. It merely places the burden on the party opposing the status quo,

6

i.e. the initial reasonableness determination. Once H5G proffers evidence suggesting that IGT acted unreasonably to avoid liability, IGT would need to respond and contest that assertion.

### E. Requirements of Fairness, Good Faith, and Non-Arbitrariness

H5G contends that the term "objectively reasonable" incorporates requirements of fairness, good faith, and non-arbitrariness.

#### i. Fairness and Good Faith

H5G argues that reasonableness by definition encompasses an "objective evaluation of fairness." Def's. Br. at 11 (collecting dictionary definitions). Further, H5G contends that this definition comports with the implied covenant of good faith and fair dealing. In light of this definition, H5G contends, IGT cannot attempt to use § 9(f) to renegotiate the permitted uses of the license agreement. This is because such use would not be objectively fair. Def's. Mem. at 10 (citing *Orange Cnty. Choppers, Inc. v. Olaes Enter., Inc.*, 497 F. Supp. 2d 541, 559 (S.D.N.Y. 2007) (unreasonable for Plaintiff to withhold "notice of approval or disapproval in order to coerce [Defendant] into accepting certain concessions in connection with renegotiation of the Agreement.")).

IGT contends that incorporating a requirement of fairness—another difficult-to-define term—would only further muddy the waters of this Court's analysis. Further, it states that the covenant of good faith and fair dealing is "inherent in all contracts" and not a "separate legal duty." *Mohegan Lake Motors, Inc. v. Maoli*, No. 16-cv-06717, 2017 WL 6335905, at *4 (S.D.N.Y. Dec. 7, 2017); see *Hard Rock Café Intern., (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2011) ("This covenant does not add obligations beyond those set forth in the agreement; rather, it protects a party to a contract from improper

7

conduct that 'subvert [s] the contract itself.'"). To the extent that it is included, IGT argues that fairness in a contract dispute means each side gets their benefit of the bargain.

Finally, IGT contests the relevancy of *Orange County Choppers*. IGT contends that decision did not rest on any principle of fairness or the implied covenant of good faith and fair dealing. Instead, IGT contends, that Court grounded their decision in specific contractual language directing the licensor to use "reasonable efforts" to notify the licensee of its approval or disapproval within fifteen days and failing to render a decision after twenty days is disapproval. *Orange Cnty. Choppers*, 497 F. Supp. 2d at 558. The court did not determine that the licensor's *rejections* were an unreasonable attempt to renegotiate the contract, but that its failure to issue *any decision*—approval or rejection—within the timeframe required by the contract was unreasonable. Such contractual requirements are not present here, IGT argues, and thus the case is inapposite.[2]

The Court largely agrees with IGT. First, H5G seeks to incorporate a non-existent fairness requirement into this contract. A court "is not free to alter the contract to reflect its personal notions of fairness and equality." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 570 (N.Y. 2002)). Second, the Court agrees with IGT that *Orange County Choppers* rested on contractual obligations absent here. With respect to the covenant of good faith and fair dealing, it is true that the covenant "cannot be used to add a new term to a contract, especially to a commercial contract between two sophisticated commercial parties represented by counsel." *LJL 33rd St Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 196 (2d Cir. 2013). Further, the covenant "does not extend so far as to undermine a party's general right to act on its own

---

[2] Further, as IGT notes, the contractual structure here is the opposite: IGT's failure to issue any decision within twenty days results in automatic *approval*. Settlement Agreement § 9(f)(iii).

8

interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *19 Recordings Ltd. v. Sony Music Ent.*, 165 F. Supp. 3d 156, 161 (S.D.N.Y. 2016) (citations omitted). Indeed, "[t]he inclusion of the phrase 'bad faith' is insufficient to sustain a breach of the covenant." *Mohegan Lake Motors*, 2017 WL 6335905, at *3. Nevertheless, the Court notes that the covenant does "bar[] a party from taking actions 'so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties.'" *LJL 33rd St Assocs.*, 725 F.3d at 196.

### ii. Non-Arbitrariness

H5G similarly contends that objections are not reasonable if "there is no objective, fair, solid, or substantial reason for the objection," i.e. when the objection is "based on arbitrary reasons." Def Mem at 14. H5G relies on landlord-tenant cases holding that landlords may not withhold consent, for instance, "because of personal whim or taste." *Id.* (citing *Am. Boo Co. v. Yeshiva Univ. Dev. Found. Inc.*, 297 N.Y.S.2d 156, 161 (N.Y. Sup. Ct. 1969)); *see also* Def Mem at 9.

As an initial matter, courts have determined that landlord-tenant cases have limited probative value in other contexts. This is because the "unique public policy considerations underlying landlord-tenant law," which "disfavors 'provisions or covenants in a lease restricting assignment or subletting'" are not present in contract or trademark law. *ESPN*, 76 F. Supp. 2d at 397; *accord Rey*, 990 F.2d at 1392 (noting that reasonableness in commercial subleases presents "a somewhat different context"). In any event, evaluating reasonableness based on a reasonable trademark owner would account for any arbitrary and impermissible justifications.

### 1. Quality-Control Provision

9

Relatedly, H5G argues that § 9(f)(iii) is "a clearly stated quality-control provision." Def Mem at 13. Accordingly, New York law provides that it must be "established, legitimate, substantial, and nonpretextual" and consistently applied. *Id.* (citing *Warner-Lambet Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996)).

IGT disputes this characterization, arguing that § 9(f) is not just a quality-control provision. Instead, IGT contends, it allows IGT to provide any "reasonable" basis for withholding approval based on quality as well as other factors such as failure to identify the IGT trademark as required under § 9(f)(i), whether all goodwill generated through the trademarks will inure to the sole benefit of IGT as required under § 9(f)(ii), and whether the goods are reputable and of reasonably high quality and would impair, dilute, or prejudice IGT's trademark rights or reputation, as discussed under § 9(f)(iii). Pl's. Opp'n. at 3-4.

IGT has the better argument. Section 9(f)(iii) surely contains a quality control provision, requiring H5G to "submit samples of approved trademark uses" when reasonably requested from IGT "for the purpose of quality control." However, as IGT discusses, § 9(f)(iii) and § 9(f) generally, contemplate reasons to reject or revoke approval that are broader than quality control.

### F. Articulation of Reasons and Opportunity for Modification

H5G argues that IGT must articulate material reasons for rejections that give H5G an opportunity to modify the use and thereafter gain approval. To support this contention, H5G points to *Rey v. Lafferty*. There, the court determined that the licensor needed to articulate a material reason for disapproval and communicate that reason in a timely and appropriate matter that "makes it possible for [the licensee] to rework the [product]" and gain approval. *Rey*, 990 F.2d at 1393 (emphasis omitted). The court further determined that "the reason for withholding product approval could not be so preclusive as to frustrate the fundamental contractual

10

assumptions" on which the contract was formed. *Id.* This rationale should apply here, H5G contends, because § 9(f)(iii) contemplates that if IGT rejects a proposed use, H5G can "modify the intended use until it obtains approval." *Id.* Failure to provide reasons that would allow modification thus would, as in *Rey*, frustrate fundamental contractual assumptions.

As IGT notes, however, in addition to being non-binding, *Rey* rested on a contractual provision not present here. That provision stated that if the licensor "disapprove[s] of any product, [it] will, if feasible, *suggest such changes* to [licensee] as may render the product acceptable to it." *Id.* at 1393 (emphasis added). Accordingly, that court did not interpret reasonableness to, as a general matter, require the licensor to submit its reasons for refusal and allow for modification; it merely interpreted *that contract* to require such actions. *Id.*[3]

Here, the contract imposes no such requirements. To be sure, as H5G contends, the contract contemplates that H5G may modify its proposed use. But unlike the contract in *Rey*, the provision does not encourage the licensor to assist the licensee in determining how to modify the use. It merely states that, if IGT rejects a proposed use, H5G must modify it to make it acceptable or cease using it. Thus, H5G here effectively asks this Court to incorporate language not found in the contract. However, "courts may not by construction add or excise terms . . . under the guise of interpreting the writing." *Law Debenture Trust*, 595 F.3d at 468 (citations and internal quotation marks omitted).

H5G contends that failing to require IGT to articulate its reasons will incentivize IGT to issue blanket rejections "on any grounds – reasonable or unreasonable" knowing it need not justify its actions. Def's. Reply. at 6. This would "render H5G's currently-irrevocable license rights under the Agreement revocable at IGT's whim." *Id.* at 7. This is not so. IGT only need

---

[3] IGT notes that, in any event, it has submitted its reasons to H5G.

11

not proffer its justifications *at the time it issues the refusals*. As discussed above, H5G bears the burden of proffering evidence that IGT's refusals were unreasonable. Then, IGT would respond contesting that assertion, and the Court would determine whether the rejections were objectively reasonable from the viewpoint of a reasonable trademark owner.

## II. Remaining Issues

The parties' briefs discuss issues beyond the scope of the question presented by the Court. First, IGT urges the Court to defer addressing the definition of reasonableness and instead address its argument that H5G should be held in contempt because "regardless of whether IGT 'unreasonably withheld' its approval, H5G has breached § 9(f) as a matter of law" by not removing the marks for which IGT denied approval. Pl's. Br. at 3. H5G contends that IGT has "waste[d] judicial time" by briefing this issue and urged the Court to sanction its behavior. Def's. Opp'n. at 11 (citing *Morley v. Ciba-Geigy Corp.*, 66 F.3d 21 (2d Cir. 1995)); *accord* Def's. Reply. at 9.

Second, H5G notes that, despite contending that reasonableness is a question of law, IGT has presented facts in its briefing, such as H5G's submissions of samples and correspondence between the parties regarding those submissions, and allegations that H5G impermissibly engaged in "self-help." Def's. Opp'n. at 9. Despite its criticism of IGT for this behavior, H5G presents facts as well. For instance, H5G seeks to differentiate its actions from the "self-help" in *ESPN*. *Id.* at 14. Additionally, H5G introduces allegations surrounding IGT's issuance of an exclusive license to DoubleUGames and DoubleDownInteractive. Def's. Reply at 5.

First, the Court will address IGT's briefing and then consider H5G's counter-claims. The entire purpose of this briefing schedule is to address the fundamental issue presented—how to define "reasonableness"—in order to make these proceedings more efficient. Second, the Court

agrees that facts regarding the application of the reasonableness standard presented by both parties are not relevant to the question presented, and does not consider them at this point. Nevertheless, without deciding the Court's power to sanction briefing beyond the scope of the question this Court presented, the Court exercises its discretion to decline to do so here. *See Perez v. Posse Comitatus*, 373 F.3d 321, 326 (2d Cir. 2004) ("Even if the district court concludes that the assertion of a given claim violates Rule 11, however, the decision whether or not to impose sanctions is a matter for the court's discretion.").

### III. Scope of Ruling

Finally, IGT contends that the standard adopted by this Court should focus only on H5G submissions 171-196, as "those are the only approvals under § 9(f) that are at issue before the Court." Pl's. Mem. at 5. H5G does not appear to address this argument. As discussed above, the Court ordered this briefing to expeditiously resolve this case. Since the central issue currently revolves around the definition of reasonableness, and since the definition of reasonableness must be the same for all proposed uses submitted under § 9(f), it would be inefficient for this Court to so limit its ruling. Accordingly, the adopted definition of reasonableness will govern all disputes regarding whether approval was unreasonably withheld in this matter.

As discussed above, the Court shall apply the following definition of "reasonable" when interpreting the parties' compliance with § 9(f): Whether IGT had an objective basis that would be acceptable from the viewpoint of a reasonable trademark owner.

**SO ORDERED.**

Dated: March 29, 2019

New York, New York

**ANDREW L. CARTER, JR.**
**United States District Judge**