UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IGT,

                    Plaintiff,

   -against-

HIGH 5 GAMES, LLC,

                    Defendant.

Docket No.: 1:17-cv-09792

# MEMORANDUM OF LAW IN OPPOSITION TO IGT'S MOTION TO DISMISS HIGH 5 GAMES, LLC'S COUNTERCLAIMS

Of Counsel:

Margot Wilensky
Jonathan Andrew Fallon (admitted *Pro Hac Vice)*
Sierra N. Kresin

# **TABLE OF AUTHORITIES**

*B&G Plastics, Inc. v. E. Creative Indus.*, 269 F. Supp. 2d 450 (S.D.N.Y. 2003)…. 15, 16

*Eckes v. Card Prices Update*, 736 F.2d 859 (2d Cir. 1984) ………………………. 15

*ESPN, Inc. v. Office of the Comm'r of Baseball*,
    76 F. Supp. 2d 383 (S.D.N.Y. 1999) …………………………………… 5

*Hallmark Aviation Ltd. v. AWAS Aviation Servs.*,
    2013 U.S. Dist. LEXIS 61705 (S.D.N.Y. 2013) ………………………….. 11

*Jewell Source, Inc. v. Primus Jewels, LLC*,
    2011 U.S. Dist. LEXIS 115830 (S.D.N.Y. 2011) ………………………… 15

*J.P. Morgan Chase Bank, N.A. v. IDW Grp., LLC*,
    2009 U.S. Dist. LEXIS 9207 (S.D.N.Y. 2009) …………………………….8, 9

*King-Devick Test Inc. v. NYU Langone Hosps.*,
    2019 U.S. Dist. LEXIS 449 (S.D.N.Y. 2019)…………………………….. 14

*Kohdeir v. Sayyed*, 323 F.R.D. 193 (S.D.N.Y. 2017)…………………………….. 3, 10, 12

*Marshall v. Hyundai Motor America*, 51 F. Supp. 3d 451 (S.D.N.Y. 2014) ……... 10

*Mr. Olympia, LLC v. Ultimate Nutrition, Inc.*,
    2018 U.S. Dist. LEXIS 41000 (S.D.N.Y. 2018) ………………………….. 8

*Padilla v. Yeshiva Univ.*, 691 Fed. Appx. 53 (2d Cir. 2017) ………………………. 12

*Santrayll v. Burrell*, 993 F. Supp. 173 (S.D.N.Y. 1998) ………………………….. 14

*Serendip LLC v. Franchise Pictures LLC*,
    2000 U.S. Dist. LEXIS 12946 (S.D.N.Y. 2000) ………………………….. 13

*Sforza v. Health Ins. Plan*, 210 A.D.2d 214 (2d Dep't 1994) ……………………….. 11

*Steginsky v. Xcelera, Inc.*, 741 F.3d 365 (2d Cir. 2014)……………………………. 3

## LEGAL STANDARD

When deciding a motion to dismiss Counterclaims, the "Court must determine if the Counterclaims contain 'sufficient factual matter' which, if accepted as true, state a claim that is 'plausible on its face.'" Khodeir v. Sayyed, 323 F.R.D. 193, 201 (S.D.N.Y. 2017). "For the purpose of deciding plaintiffs' motion to dismiss [defendant's] Counterclaims, the Court assumes that the factual allegations … are true and draws all reasonable inferences in [defendant's] favor. Id., at 198; *citing* Steginsky v. Xcelera Inc., 741 F.3d 365, 368 (2d Cir. 2014).

## BACKGROUND & PROCEDURAL HISTORY

Effective January 1, 2016, IGT and High 5 Games, LLC (hereinafter, "H5G") executed a Settlement Agreement (hereinafter, the "Settlement Agreement") to resolve a dispute between the parties.[1] The Settlement Agreement sets forth the rights of the parties regarding the intellectual property contained in over one hundred games that were already in existence and being used in commerce at the time the Settlement Agreement was executed. ECF No. 82.

Under the Settlement Agreement, H5G was granted broad licenses to use, sell, reproduce, modify, create derivative works of, and otherwise exploit *many* of the games listed in the exhibits to the Settlement Agreement. *See*, ECF No. 82, Sections 9(a) - 9(e), pp. 7-9.

Section 9(f) of the Settlement Agreement includes additional "further conditions" applicable to the trademark licenses granted to H5G under the Settlement Agreement. Specifically, Section 9(f)(iii) provides:

> Before using any of the trademarks in commerce or otherwise publicly displaying their intended use, H5G must submit a representative sample or mock up of the expected usage to IGT … for approval, such approval not to be unreasonably withheld…. IGT may refuse or revoke its approval or deemed approval if at any time it *reasonably* believes that the usage is or will be

---

[1] For a full recitation of the background between the parties, please see H5G's Answer to IGT's Second Amended Complaint ("H5G's Answer"), ¶¶ 108-116. ECF No. 149.

> impairing, prejudicing, or diluting IGT's rights in the trademarks
> or the reputation of IGT or any of its Affiliates.

ECF No. 82, Section 9(f)(iii), pp. 9-10.

All of the trademark uses contained within the games contemplated by the Settlement Agreement had already been approved of by IGT (during the parties' 15-year relationship) and had been used in commerce prior to the execution of the Settlement Agreement. See H5G's Answer IGT's Second Amended Complaint, (hereinafter, "Answer"), ECF No. 149, at ¶¶ 135-136. As such, the conditions outlined by Section 9(f)(iii) of the Settlement Agreement had been satisfied.

Moreover, following the execution and implementation of the Settlement Agreement, H5G continued to use the IGT trademarks that it had previously been using in commerce, exactly as IGT had previously accepted, and exactly as IGT had licensed them to H5G, pursuant to the licenses granted to H5G under Sections 9(a) through 9(e) of the Settlement Agreement. Id. H5G was not required to submit representative samples or mock-ups of its expected usage of these trademarks, pursuant to Section 9(f) of the Settlement Agreement, because these trademarks were already being used in commerce by H5G and IGT, in an identical, or near identical manner. Despite extensive knowledge that H5G was continuing to use the marks as previously accepted, IGT never requested samples or mock-ups.

Notably, in 2017, a few months before IGT filed its complaint this action, IGT sold its ownership of Double Down Interactive, LLC ("Double Down"), which owned Double Down Casino, the technology and database information associated therewith, as well as other minor assets, to a Korean-based gaming company, DoubleU Games, LLC (alone as "DoubleU," and inclusive of one of more of its affiliates and/or subsidiaries, including DoubleDown, as "DoubleU Group"), for $825 million. Upon information and belief, IGT granted **exclusive**

license rights to the DoubleU Group to a set of IGT's intellectual property, including the trademarks and artwork of Golden Goddess, DaVinci Diamonds and Cats slot games, to which non-exclusive license rights were granted to H5G in the Settlement Agreement. Id., at ¶¶ 137-142.

Since the commencement of this action, H5G submitted representative samples of its intended uses of the Golden Goddess, Cats, and Da Vinci Diamonds trademarks in compliance with this Court's March 16, 2018 Order. ECF No. 69. The aforementioned representative samples submitted to IGT included identical, or nearly identical, trademark uses to those previously approved by IGT. See Answer, at ¶¶ 165-180. Despite this, IGT *unreasonably* denied approval of H5G's representative samples, in breach of Section 9(f)(iii) of the Settlement Agreement. Id.

## ARGUMENT

### I. H5G's First Counterclaim Pleads Facts Sufficient to Prove the Elements of a Breach of Contract Claim

It is axiomatic that "under New York law an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." ESPN, Inc. v. Office of the Comm'r of Baseball, 76 F. Supp. 2d 383, 401 (S.D.N.Y. 1999). Contrary to IGT's assertions in its Motion to Dismiss H5G's Counterclaims (hereinafter, "Motion"), H5G has, in fact, pled facts sufficient to prove all four elements of a Breach of Contract Counterclaim, including performance of the contract *by H5G* and damages *to H5G*.

First, H5G's Answer pleads facts sufficient to prove the first element of a Breach of Contract Counterclaim – the existence of a contract. H5G alleges in its first counterclaim: "The Settlement Agreement is a valid and enforceable contract." See Answer, at ¶ 161.

Second, H5G has pled facts that, if accepted as true, are sufficient to prove the second element of a Breach of Contract Counterclaim – performance of the contract by H5G.

H5G's Answer, under *Activities Giving Rise to this Action,* states the following:

> 135. Following the January 1, 2016 execution and implementation of the Settlement Agreement, H5G continued to use the IGT trademarks that it had previously been using in commerce, *exactly as IGT had previously accepted*, and exactly as IGT had licensed them to H5G, pursuant to the licenses granted to H5G under Sections 9(a) through 9(e) of the Settlement Agreement.
>
> 136. H5G was not required to submit representative samples or mock-ups of its expected usage of these trademarks, pursuant to Section 9(f) of the Settlement Agreement, because these trademarks were already being used in commerce by H5G and IGT, in an identical, or near identical manner.

See Answer, at ¶¶ 135-136. These allegations are incorporated into H5G's First Counterclaim under ¶ 160, which provides, "H5G hereby repeats and realleges the allegations contained in paragraphs 108-159 as if more fully set forth herein." Id., at ¶ 160. There was no breach of Section 9(f) of the Settlement Agreement by H5G as the same, identical trademark uses had been previously accepted by IGT and had been used in commerce by H5G prior to the Parties' 2016 Settlement Agreement [ECF 82]. As such, no further approval under Section 9(f) was necessary. Id., at ¶¶ 135-136.

Despite the previous acceptance by IGT of a myriad use of marks, H5G, complying with this Court's March 16, 2018 Order, did submit representative samples (Requests numbered 000001-000196) to IGT for "approval." Id., at ¶¶ 165-180. Notably, in submitting these samples, H5G did not concede that it was *required* to submit these samples under Section 9(f) of the Settlement Agreement – it was simply complying with the Court's Order, which importantly was issued prior to the subsequent Order requiring the parties to brief the fundamental issue of reasonableness, which the Court determined was a question of law. ECF No. 100.

Third, H5G has pled facts that, if accepted as true, are sufficient to prove the third element of a Breach of Contract Counterclaim – breach by IGT. Notably, the samples submitted to IGT for approval were identical to the trademark uses that had previously been approved by IGT prior to the 2016 Settlement Agreement. Despite this, IGT unreasonably withheld its approval of H5G's requested trademark uses in violation of Section 9(f) of the Settlement Agreement. See Answer, at ¶¶ 165-180. H5G's Answer alleges this: "Section 9(f) of the parties' Settlement Agreement requires that H5G seek approval from IGT upon the submission of representative samples and mock-ups, "whereby such approval [is] not to be unreasonably withheld." Id., at ¶ 164. As such, H5G has also pled facts which, accepted as true, are sufficient to prove the third element of a Breach of Contract Counterclaim – breach of contract by IGT.

Finally, H5G has also pled facts sufficient to prove the fourth element of a Breach of Contract Counterclaim – damages. As clearly set forth in H5G's Counterclaim, IGT is preventing H5G's enjoyment of the benefits negotiated within the Settlement Agreement. Id., at ¶ 179. Moreover, H5G plainly alleges:

> 196. H5G has been materially harmed and damages as a result of the breaches by IGT. A monetary remedy alone cannot adequately compensate H5G, and thus, H5G is entitled to an award of specific performance of the Settlement Agreement.
>
> 197. H5G seeks monetary damages in an amount to be proven at trial.

Id., at ¶¶ 196-197. These facts, accepted as true, are sufficient to prove the fourth element of a Breach of Contract Counterclaim – damages. Accordingly, H5G has sufficiently pled facts sufficient to support a Breach of Contract Counterclaim.

Oddly, IGT argues that H5G's alleged breach is material as a matter of law, claiming that H5G's omission of representative samples defeated the objective of the Settlement Agreement and insinuating that H5G's license to use certain marks was terminated by agreement. IGT

simultaneously argues, however, that the license was not terminated, but instead required new, written authorization. See Motion, at pp. 12-13 (*citing* E.D. Pa. cases, which are governed by the third, not second circuit, and which are not even relevant or binding). Indeed, the section of the Settlement Agreement that IGT harps on with regard to breach of contract – 9(f) – is a quality control provision, was intended as such, was written as such, was treated as such, and should govern as such. Accordingly, H5G had no obligation to submit samples of uses that had been in use long before the Settlement Agreement, which were unquestionably accepted and approved by IGT.

## II. H5G's Second Counterclaim Pleads Facts Sufficient to Prove the Elements of a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

IGT argues that H5G's second counterclaim fails because it contains no factual allegations different from the factual allegations underlying its accompanying Breach of Contract Counterclaim. "In order to simultaneously allege 'breach of contract and implied covenant claims under New York law, a plaintiff must allege an implied duty that is consistent with the express contractual terms, but base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims.'" See Motion, at p. 14; Mr. Olympia, LLC v. Ultimate Nutrition, Inc., 2018 U.S. Dist. LEXIS 41000, *11 (S.D.N.Y. 2018) (*quoting* JPMorgan Chase Bank, N.A. v. IDW Grp., LLC, 2009 U.S. Dist. LEXIS 9207, *16 (S.D.N.Y. 2009)). H5G's second counterclaim for breach of implied covenant of good faith and fair dealing satisfies the elements required to maintain both that counterclaim and its first counterclaim for breach of contract. Thus, IGT's duplicative argument fails.

H5G did, in fact, base its Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing on a factual predicate that is different than the facts giving rise to H5G's Breach of Contract Counterclaim. H5G's Counterclaim for Breach of Contract is based on the

-8-
5186453-1

following fact – "IGT has failed to provide a reasonable, objective basis ('that would be acceptable from the viewpoint of a reasonable trademark owner') as to the denial of all submissions, which is required by Section 9(f)(iii) of the Settlement Agreement." See Answer, at ¶ 173. Moreover, IGT's repeated demands to H5G to cease and desist H5G's use of the trademarks and copyrighted works that are properly being used by H5G pursuant to the licenses granted under Settlement Agreement is a material breach of the agreed-to Settlement Agreement. Id., at ¶ 163.

Conversely, H5G's Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing is based on the following facts – "After issuing [an] Irrevocable License to H5G … IGT attempted to revoke and constructively revoked the Irrevocable License issued to H5G in favor of unlawfully issuing a subsequent exclusive for, and among other things, the same marks and artwork to H5G's competitor…" Id., at ¶¶ 202-203.

As set forth in JPMorgan Chase Bank, N.A. v. IDW Grp., LLC, on which IGT relies:

> [T]here exists under New York law an implied covenant of good faith and fair dealing, pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. [W]here a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties, the implied covenant of good faith may be implicated.

2009 U.S. Dist. LEXIS 9207, at *11-12 (S.D.N.Y. 2009).

Pursuant to the Settlement Agreement, IGT granted to H5G a non-exclusive, irrevocable license to use certain trademarks and artwork. Thereafter, IGT granted an *exclusive* license to a competitor to use, among other things, those same marks and artwork. These actions by IGT "directly destroy the value of the contract for [H5G]" and would be entirely "contrary to the intention of the parties" when they entered into the Settlement Agreement. Id. Moreover, these

facts are distinct and different than the facts underlying H5G's Breach of Contract Counterclaim, which is based upon the fact that IGT has failed to provide a reasonable and objective basis as to the denial of all of H5G's requested trademark uses, in breach of Section 9(f) of the Settlement Agreement.

Finally, H5G has, again, pled facts sufficient to prove damages. H5G alleges in its Second Counterclaim, "[t]hese actions by IGT are acts demonstrating IGT's breach of good faith and fair dealing, and have caused, and continue to cause, substantial damage to H5G." See Answer, at ¶ 204. This statement, accepted as true and drawing all reasonable inferences in H5G's favor, sufficiently alleges damages. See, e.g. Khodeir v. Sayyed, 323 F.R.D. 193 (S.D.N.Y. 2017). Based on the foregoing, H5G has pled facts sufficient to support its Counterclaim against IGT for Breach of the Implied Covenant of Good Faith and Fair Dealing.

### III. H5G's Third Counterclaim Pleads Facts Sufficient to Prove the Elements of a Claim for Unjust Enrichment

IGT alleges that H5G may not recover under a quasi-contract theory, such as unjust enrichment, because a valid contract governs the subject matter in the lawsuit. See Motion, at p. 16; *citing* Marshall v. Hyundai Motor America, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014). H5G, has, however, pled sufficient facts to maintain this Counterclaim, specifically that IGT improperly granted a third party exclusive rights to use various trademarks, which license was previously granted to IGT on an irrevocable, non-exclusive basis.

H5G's unjust enrichment Counterclaim against IGT is based on the following facts:

> 207. IGT blatantly disregarded H5G's irrevocable, non-exclusive license to the artwork and trademarks at issue in this action, in granting its *exclusive* license to the same rights to certain artwork and trademarks, for a significant sum to the DoubleU Group.
>
> 214. As a result of IGT's complete disregard of H5G's licensed rights, H5G's reputation is being harmed, as IGT and the DoubleU

> group have publically announced and advertised their exclusive licensing agreement, and IGT is being unjustly enriched.

See Answer, at ¶¶ 207, 214 (emphasis added). Although the Settlement Agreement governs the licenses granted to H5G to use IGT's trademarks and artwork, IGT's subsequent sale of Double Down Interactive, LLC ("Double Down Interactive") to DoubleU Games, LLC ("DoubleU Games") is outside the four corners of the Settlement Agreement.

> [T]he threshold question is whether an enforceable contract exists *that governs the subject matter underlying the unjust enrichment claim*…. However, it is not always apparent at the pleading stage whether a contract both is valid and governs the subject matter of the dispute…. The Court is again mindful of the fact that all reasonable inferences must be drawn in the non-movant's favor…. The Court therefore concludes that it would be premature to dismiss the unjust enrichment cause of action at this time.

See Hallmark Aviation Ltd. v. AWAS Aviation Servs., 2013 U.S. Dist. LEXIS 61705 (S.D.N.Y. 2013) (emphasis added) (internal citations omitted); see also, Sforza v. Health Ins. Plan, 210 A.D.2d 214, 215 (2d Dep't. 1994) ("because where, as here, there is a bona fide dispute as to the existence of a contract *or where the contract does not cover the dispute in issue*, a plaintiff may proceed upon a theory of quantum meruit as well as contract, and will not be required to elect his or her remedies") (emphasis added).

IGT also alleges that even if H5G's Counterclaim for Unjust Enrichment is not barred, H5G has not pled sufficient facts to state a claim for relief – "For example, H5G has no factual basis in its pleadings … for its allegations that IGT allegedly granted 'an exclusive license for the same rights to certain artwork and trademarks' to DoubleU Games…" See Motion, at p. 16. However, in IGT's Answer to H5G's Counterclaims, IGT **admits** "that in 2017 IGT sold ownership of Double Down Interactive, LLC to DoubleU Diamond, LLC. See IGT's Answer to Counterclaims, ECF No. 159, at ¶ 137. Indeed, Da Vinci Diamonds, Golden Goddess, and Cats

(among others) are all games offered on IGT's Double Down Casino. See screenshots attached hereto as **Exhibit A.**

As such, H5G *has*, in fact, pled sufficient facts to state a claim for relief that is plausible on its face. "Since a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a [party] need only allege enough facts to raise a right to relief above the speculative level and to state a claim that is plausible on its face." Padilla v. Yeshiva Univ., 691 Fed. Appx. 53, 55 (2d Cir. 2017) (internal quotations omitted). These facts concerning IGT's sale to DoubleU, accepted as true, sufficiently state a claim to relief that is plausible on its face. See Khodeir v. Sayyed, 323 F.R.D. 193 (S.D.N.Y. 2017) ("For the purpose of deciding plaintiffs' motion to dismiss [defendant's] Counterclaims, the Court assumes that the factual allegations … are true and draws all reasonable inferences in his favor.").

IGT further alleges that even if an agreement between IGT and DoubleU did include an exclusive license agreement to use IGT's intellectual property, such a license "would not necessarily supersede or impair a prior non-exclusive licensee's right." See Motion, at p. 17. IGT cites to two cases that are highly fact specific, and thus easily distinguishable.[2] The fact that IGT itself notes that "a subsequent exclusive license *would not necessarily* supersede or impair a prior non-exclusive licensee's right," indicates that a subsequent exclusive license *could*, in fact, supersede or impair H5G's prior, non-exclusive rights. Such an evaluation is fact sensitive and

---

[2] In the first case, *Mechanical Ice Tray Corp. v. General Motors Corp.*, the defendant was exclusively licensed under the patents with the exception of a non-exclusive license to Westinghouse Electric & Manufacturing Company. The agreement specifically carved out the exception to the defendant's exclusive license, and even provided "that if the Westinghouse license should be terminated the defendant should become the sole licensee." Mechanical Ice Tray Corp. v. General Motors Corp., 144 F. 2d 720, 722 (2d Cir. 1944). The second case IGT cites to, *Research Frontiers, Inc. v. Marks Polarized Corp.*, notes that the fact that a license is subject to rights previously granted to others, does not prevent the license from agreement from being an exclusive license agreement so long as "the license agreement bars the licensor from enlarging the scope of existing licenses or increasing the number of license." Research Frontiers v. Marks Polarized Corp., 290 F. Supp. 725, 727 (E.D.N.Y. 1968).

highly dependent upon the language contained within the agreement between IGT and DoubleU. Therefore, dismissing this Counterclaim at this juncture in the case is premature.

Finally, IGT argues that "H5G has failed to allege sufficient facts to prove that it has been damaged in any way by IGT's alleged unjust enrichment." Id. An unjust enrichment claim under New York law must contain the following elements: (1) IGT was enriched; (2) enrichment was at H5G's expense; and (3) IGT's retention of the benefit would be unjust. See Serendip LLC v. Franchise Pictures LLC, 2000 U.S. Dist. LEXIS 12946 (S.D.N.Y. 2000). H5G's Counterclaim alleges: (1) IGT blatantly disregarded H5G's license to the artwork and trademarks at issue in this action in its granting of an *exclusive* license to DoubleU Group for a significant sum; (2) H5G has been damaged as a direct and proximate result of IGT's actions, including reputational harm; and (3) IGT was enriched at the expense of H5G, and IGT's retention of the benefit is unjust. See Answer, at ¶¶ 206-217. Therefore, H5G has pled facts that, accepted as true, are sufficient to support its Unjust Enrichment Counterclaim.

### IV. H5G's Fourth Counterclaim Pleads Facts Sufficient to Prove the Elements of a Claim for Declaratory Judgment of Copyright Invalidity

IGT argues that to prove IGT's copyrights are invalid, H5G must establish the following: "(1) that the application for copyright registration is factually inaccurate, (2) that the inaccuracies were willful or deliberate, and (3) that the Copyright Office relied on those misrepresentations." See Motion, at p. 18. H5G has pled facts sufficient to meet this standard.

First, H5G has pled facts sufficient to establish that IGT's application for copyright registration is factually inaccurate:

> Pursuant to the Public Catalog for the copyright registrations at issue, IGT failed to disclose that it is not the owner of the original work. A lot of the stock art used as the base images to create images related to these purported copyright registrations is owned by Getty Images, Inc. ("Getty Images"), and licensed to H5G.

See Answer, at ¶¶ 232-233. Accordingly, H5G has established the first element of its Counterclaim.

H5G has also pled facts sufficient to establish the second element – the inaccuracies contained in IGT's copyright registration were willful and/or deliberate. In its Counterclaim, H5G asserts that "IGT had and has knowledge that the images are owned by Getty Images and IGT failed to acknowledge the source of artwork. Id., at ¶ 234.

Finally, H5G has pled facts sufficient to establish the third element – the Copyright Office relied on those misrepresentations. H5G asserts:

> IGT has submitted factual misrepresentations and inaccuracies to the Copyright Office for malicious purposes of quickly obtaining copyright registrations to use in a federal lawsuit against H5G. Copyright registration creates a rebuttable presumption that all facts stated within the submission to the Copyright Office are true, however the facts submitted by IGT to the Copyright Office are false. IGT cannot enjoy the protections of copyright registration as to the alleged copyrighted work.

Id., at ¶¶ 237-239. These allegations, taken as true and when drawing all reasonable inference in H5G's favor, plead facts sufficient to establish that the Copyright Office relied on the misrepresentations and inaccuracies contained in IGT's copyright registration. See King-Devick Test Inc. v. NYU Langone Hosps., 2019 U.S. Dist. LEXIS 449, *18 (S.D.N.Y. 2019) (Where an applicant for a registered copyright 'fails to advise the Copyright Office of the reliance upon the work of another, *the [applicant] does not afford the Office the fair opportunity to pass upon the question of originality in relation to the prior work*.'") (emphasis added); see also Santrayll v. Burrell, 993 F. Supp. 173, 176 (S.D.N.Y. 1998) ("the Second Circuit has held that the knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid and thus incapable of

supporting an infringement action…") (*quoting* Eckes v. Card Prices Update, 736 F.2d 859, 861-62 (2d Cir. 1984)).

Accordingly, H5G has in fact, alleged facts that accepted as true and drawing all reasonable inferences in H5G's favor, support a viable claim for copyright invalidity.

V. **H5G's Fifth Counterclaim Pleads Facts Sufficient to Prove the Elements of a Claim for Tortious Interference with Prospective Business Relations**

IGT argues that "[t]o adequately plead tortious interference with prospective business relations, a plaintiff must allege that defendant's conduct was motivated solely by malice or to inflict injury by unlawful means, beyond mere self-interest or economic advantage." See Motion, at p. 19; *citing* Jewel Source, Inc. v. Primus Jewels, LLC, 2011 U.S. Dist. LEXIS 115830, *10 (S.D.N.Y. 2011). IGT claims that H5G's Counterclaim does not allege that IGT was motivated solely by malice or to inflict injury by unlawful means, and as such it should be dismissed.

Fatally, the standard cited by IGT is incomplete. The elements of a Counterclaim for Tortious Interference with Prospective Business Relations, in their entirety, are:

> (1) a plaintiff's business relationship with a third party; (2) the defendant's interference with that business relationship; (3) a showing that the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship.
>
> To satisfy the third requirement, a plaintiff must demonstrate that the action complained of was motivated solely by malice *or to inflict injury by unlawful means* rather than by self-interest or other economic considerations.

B&G Plastics, Inc. v. E. Creative Indus., 269 F. Supp. 2d 450, 468 (S.D.N.Y. 2003) (internal quotations omitted) (emphasis added).

H5G has pled facts sufficient to satisfy these elements. First, H5G's Counterclaim alleges: "IGT knows that H5G had, and has, ongoing and prospective business relationships with current and prospective H5G customers." See Answer, at ¶ 243. This satisfies the first element.

-15-

Second, H5G alleges, "IGT and Double Down knew that by attempting to revoke, and constructively revoking, the Irrevocable License, IGT would, and did, interfere with H5G's ability to maintain business relationships with H5G's existing customers." Id., at ¶ 247. This satisfies the second element.

H5G has also pled facts sufficient to satisfy the third element – IGT used dishonest, unfair, or improper means. To satisfy this third requirement, H5G's Counterclaim must allege that IGT's actions were either (a) motivated solely by malice, or (b) to inflict injury *by unlawful means*. B&G Plastics, Inc., 269 F. Supp. 2d 450 at 468. Assuming the factual allegations contained in H5G's Counterclaim are true and drawing all reasonable inferences in H5G's favor, H5G has pled facts sufficient to satisfy the third element of Tortious Interference with Prospective Business Relations Counterclaim – H5G has alleged that (a) IGT inflicted injury upon H5G by interfering with H5G's ability to fairly compete with Double Down (b) by *unlawfully* issuing an exclusive license to Double Down for the same marks and artwork that H5G's was previously granted an irrevocable, non-exclusive license to use. See Answer, at ¶¶ 248-249.

Finally, H5G has also pled facts sufficient to satisfy the fourth element of a Tortious Interference with Prospective Business Relations Counterclaim – injury to the relationship. H5G has alleged that IGT's actions have "interfere[d] with H5G's ability to maintain business relationships with H5G's existing customers" and "interfere[d] with H5G's ability to fairly compete with Double Down." Id., at ¶¶ 247-249.

Based on the foregoing, H5G has pled facts sufficient to satisfy all four elements of a Tortious Interference with Prospective Business Relations Counterclaim: (1) H5G had, and has, ongoing and prospective business relationships with current and prospective H5G customers; (2)

IGT's revocation of the Irrevocable Licenses interfered with H5G's ability to maintain business relationships with H5G's existing customers; (3) IGT inflicted this injury through the *unlawful* means of issuing an exclusive license to Double Down for the same marks and artwork that H5G's was previously granted an irrevocable, non-exclusive license to use; and (4) these actions have interfered with H5G's ability to maintain business relationships with H5G's existing customers and have interfered with H5G's ability to fairly compete with Double Down.

## CONCLUSION

Based on the foregoing, H5G has pled facts that, accepted as true and drawing all reasonable inferences in H5G's favor, sufficiently plead all five of H5Gs Counterclaims: (1) Breach of Contract; (2) Breach of the Implied Covenant of Good Faith and Fair Dealing; (3) Unjust Enrichment; (4) Declaratory Judgment of Copyright Invalidity; and (5) Tortious Interference with Prospective Business Relations.

**WHEREFORE**, H5G requests that this Court deny IGT's Motion to Dismiss H5G's Counterclaims in its entirety, and for such further relief as this Court may deem just and proper.

Dated: New York, New York
October 1, 2019

_/s/ Margot Wilensky_
Margot Wilensky(MW-3181)
Sierra N. Kresin
CONNELL FOLEY LLP
*Attorneys for Defendant, High 5 Games, LLC*
888 7th Avenue, 9th Floor
New York, New York 10106
Telephone: (212) 307-3700
Facsimile: (212) 262-0050
E-mail: mwilensky@connellfoley.com
E-mail: skresin@connellfoley.com
Jonathan Andrew Fallon (admitted *Pro Hac Vice)*